[866 NYS2d 120]

SHARON WECHSLER, Respondent, v NORMAN WECHSLER, Appellant.

First Department, October 21, 2008

**APPEARANCES OF COUNSEL**

*Blank Rome LLP,* New York City (*Leonard G. Florescue, Heidi A. Tallentire* and *Tara Jones-Willecke* of counsel), for appellant.

*Bernard G. Post LLP,* New York City (*Bernard G. Post* and *William S. Hochenberg* of counsel), for respondent.

**OPINION OF THE COURT**

McGUIRE, J.

The course of this appeal, like the underlying divorce action itself, has not been smooth. The judgment of divorce from which the defendant husband appeals was entered on February 3, 2006. Between the entry of the judgment and the date the appeal was argued, the parties made numerous motions in both Supreme Court and this Court. The plaintiff-respondent wife sought to compel the husband to comply with certain terms of the judgment and ensuing orders, and the husband sought to stay enforcement of the judgment and those orders pending the determination of his appeal. The wife's motions were granted and the husband's motions were denied.

Shortly after oral argument, the wife moved to dismiss the appeal on the ground that the husband was a fugitive from this jurisdiction and barred from maintaining the appeal under the fugitive disentitlement doctrine. The husband separately moved to stay enforcement of the judgment pending determination of this appeal. By an order dated November 27, 2007, we granted the wife's motion and dismissed the appeal with leave to the husband to move to reinstate the appeal on the condition that, within a certain time frame, he post an undertaking of approximately $10 million (45 AD3d 470 [2007]). The husband posted the undertaking and moved to reinstate the appeal. We granted the husband's motion on January 31, 2008 (2008 NY Slip Op 62578[U]), and subsequently granted the husband's renewed motion for a stay of the enforcement of the judgment pending determination of this appeal (2008 NY Slip Op 83492[U]).

I

The principal issue on this appeal, apparently one of first impression in this state, is the extent to which the value of a holding company, Wechsler & Co., Inc. (WCI), a subchapter C corporation, all the shares of which are owned by the husband, should be reduced to reflect the federal and state taxes embedded in the securities owned by WCI, securities that constitute virtually all of its assets, due to the unrealized appreciation of those securities. As of the valuation date, the date the divorce action was commenced, WCI had essentially ceased trading se-

curities for the accounts of customers and bought and sold securities solely for its own account. All of the experts who testified at trial—the neutral expert jointly chosen by the parties and the two experts separately retained by each—agreed that WCI should be valued on a net asset basis by determining what a willing buyer would pay a willing seller, with neither being under a compulsion to buy or sell, and with both having reasonable knowledge of the relevant facts (*see generally Eisenberg v Commissioner of Internal Revenue*, 155 F3d 50, 53 [2d Cir 1998]). Supreme Court adopted a "baseline" value of WCI of $70,848,107 on the date the action was commenced, the baseline value determined by the neutral expert before any deduction for embedded taxes—that amount is not disputed on this appeal—and then made adjustments to it that differed in various ways, most significantly for present purposes with respect to the extent of the reduction for the embedded taxes, from the adjustments made by the neutral expert.[1]

On the issue of the extent of the reduction for embedded taxes, Supreme Court rejected the approach of the Fifth Circuit in *Dunn v Commissioner of Internal Revenue* (301 F3d 339 [5th Cir 2002]), the approach embraced by the neutral expert. Pursuant to that approach, consistent with the assumption inherent in the net asset valuation methodology—an actual sale of the corporation's assets is assumed to occur on the valuation date, here, the date of commencement of the action—the value of the corporation is reduced on a dollar-for-dollar basis by the full amount of the tax liability that would arise from the sale of the assets by the hypothetical buyer on the valuation date. Both the neutral expert and the husband's expert testified, and the wife's expert did not dispute, that if the securities were sold as of the date of commencement, the effective tax rate would be 41.74% of the baseline value of $70,848,107. Accordingly, under the valuation methodology adopted in *Dunn,* the date-of-commencement value of WCI would be reduced by $29,572,000 (41.74% of $70,848,107). Instead, Supreme Court accepted the approach of the wife's expert and reduced the baseline value of WCI by 11% of $70,848,107 ($7,793,292). That percentage approximates what Supreme Court and the wife's expert denomi-

---

1. In its written opinion, Supreme Court adopted a "baseline" value of $51,100,000, an amount that reflects the after-tax value of WCI under the approach of both the neutral expert and the husband's expert. Because it will be easier to follow our analysis, the "baseline" value to which we refer is the pretax value of WCI.

nated the "historical" rate of the annual taxes paid by WCI, a rate determined by comparing the average annual taxes paid by WCI to its average annual gross revenue, i.e., its revenue before all applicable deductions for its various costs of doing business (including the salaries of its employees).

In a comprehensive, thoughtful and painstaking 129-page written opinion, Supreme Court relied in significant part on the decision of the Tax Court in *Estate of Jelke v Commissioner of Internal Revenue* (TC Memo 2005-131 [2005]),[2] a decision that was reversed by a divided panel of the Eleventh Circuit after this appeal was argued (507 F3d 1317 [2007]). In *Jelke*, the Eleventh Circuit adopted the approach of the Fifth Circuit in *Dunn* and concluded that, on the assumption that a sale of the corporation's assets occurs on the valuation date, the value of the corporation's assets should be reduced by the full amount of the embedded taxes that would be payable as a result of the sale (507 F3d at 1331-1333).

The crux of the majority's analysis in *Jelke* is captured by an illuminating example it cited (507 F3d at 1326 n 25), one the Second Circuit posited in *Eisenberg* (155 F3d at 58 n 15; *see also Dunn*, 301 F3d at 352 n 23). To simplify the example, suppose that a corporation's sole asset is a machine with a market value of $1,000, a basis of $200 and a tax rate of 25% on the gain from the sale of the machine. If A, the sole shareholder of the corporation, offers to sell all of the corporation's shares to Z, what would Z pay to own those shares and thus own the machine? Clearly, Z would not pay $1,000, because he would be saddled with the corporation's basis in the machine and thus would be buying an asset as to which he would have a tax liability of $200 (25% of the $800 in appreciation) if he were to sell it for $1,000. The only rational decision for Z would be to buy the machine itself in the market for $1,000 rather than indirectly buy the machine by paying $1,000 for the stock of the corporation, as Z's basis in the machine then would be $1,000 and Z would have no tax liability if Z were to sell it for $1,000 or less (and a smaller tax liability to the extent the machine appreciated in value after Z purchased it). As discussed below, however, it does not follow that under no circumstances would Z be willing to pay more than $800 for the stock of the corporation.

---

**2.** As discussed below, however, the approach adopted by Supreme Court differs significantly from the one adopted by the Tax Court in *Jelke*.

In his dissenting opinion in *Jelke*, Judge Carnes concluded that the position of the Commissioner was more reasonable (507 F3d at 1333). Under the Commissioner's approach, the period of time over which the appreciated assets of the corporation would be sold should be estimated and the value of the corporation should be reduced only after discounting to present value as of the valuation date the taxes that would come due over that period. The Commissioner's approach recognizes that because of the time value of money, a reasonable buyer who does not plan on immediately liquidating the assets of the corporation could pay more for the stock of the corporation than an amount equal to the market value of its assets minus the taxes that would be payable if the assets were sold immediately. The majority in *Jelke* did not dispute that point with Judge Carnes, but concluded that the approach of the Fifth Circuit in *Dunn* avoids the need for and uncertainties of "prophesying as to when the assets will be sold" (507 F3d at 1332),[3] conserves judicial resources as it "has the virtue of simplicity" (*id.* at 1333), is consistent with the basic premise of valuing a corporation on a net asset basis, i.e., the sale of its assets on the relevant valuation date (*id.* at 1332-1333) and has much else to recommend it (*id.* at 1333).[4]

The merits and demerits of the two approaches are elucidated by the majority and dissenting opinions in *Jelke*, and each opinion surveys the history and evolution of the law on this complex subject. This appeal, however, does not require us to reach a conclusion about which of the two approaches is prefer-

---

**3.** Although not mentioned by the Eleventh Circuit, the Commissioner's approach also would seem to require uncertain prognostications about the value of the assets in each of the years it is predicted they will be sold. Alternatively, the Commissioner's methodology may assume that the market value of the assets remains constant over the predicted period during which they are sold. If so, the justification for the Commissioner's approach—greater accuracy by valuing assets in light of an economic reality, the time value of money—is undermined to the extent of the volatility of the market price of the particular assets to be valued.

**4.** In *Eisenberg*, the Second Circuit concluded, contrary to the position then espoused by the Commissioner, that a reduction in value of the corporation to account for embedded capital gains taxes was appropriate. However, as the Eleventh Circuit noted in *Jelke* (507 F3d at 1326), dictum in *Eisenberg* states without explanation that "it would be incorrect to conclude that the full amount of the potential capital gains tax should be used" to reduce the corporation's value (citing 155 F3d at 58 n 15). For various reasons, the Eleventh Circuit decided not to adopt the position presumably inherent in that dictum that would require complex prognostications for which the judiciary is ill suited.

able with respect to the issue of embedded taxes.[5] At trial, Supreme Court was not asked to choose between the approach of the Fifth Circuit in *Dunn* and subsequently embraced by the Eleventh Circuit in *Jelke* and the approach advanced by the Commissioner in *Jelke* (and embraced by Judge Carnes). Rather, Supreme Court was asked to choose between the approach of the Fifth Circuit and an approach different from the one advanced by the Commissioner in *Jelke*. The latter approach, the one Supreme Court adopted, does not attempt to ascertain the period of time over which the assets of a corporation would be sold by a reasonable buyer and discount the taxes that would be due over that period to present value as of the date of commencement. Rather, it adopts a baseline value of the assets as of the commencement date and reduces that value by an "historical" tax rate of the corporation.

Both the neutral expert and the husband's expert vehemently disagreed with the "historical" approach espoused by the wife's expert. For his part, the neutral expert testified that this "historical" tax rate was a "meaningless percentage to apply to the capital gains." He explained that it ignored the difference between an effective tax rate and an "incremental" or marginal tax rate, and stressed that if in any given year WCI sold securities for a $10 million capital gain, it would incur incremental taxes in the amount of 41.74% of that gain. Similarly, the husband's expert testified that this "historical" tax rate was "incredibly inaccurate," explaining that "[t]he correct way to calculate a tax rate is a percentage of pretax income after expenses." Indeed, he added that he had "never before seen anyone . . . calculate a tax rate as a percentage of [gross] revenues rather than as a percentage of pretax earnings [after expenses]." The common sense of the view of both the neutral expert and the husband's expert is apparent. Notably, the wife

---

5. In matrimonial actions in other states, some courts have accepted and some have rejected the validity of a reduction in value for embedded capital gains (*see* Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, at 463-464 [5th ed 2008]). According to the authors, however, "most decisions in family law courts to date have not allowed a discount for trapped-in capital gains unless a sale was imminent" (*id.* at 463). In this regard, we note that the Court of Appeals has stated that "uncertainty concerning future events should not bar attempts to assign value to an asset" (*Burns v Burns*, 84 NY2d 369, 375 [1994]). That is not to suggest, however, that the Court of Appeals thereby has ruled that judges in matrimonial actions never may conclude that a future event is too fraught with uncertainties to be grappled with and taken into account.

offered nothing by way of precedent to support her expert's position. Nor, for that matter, does the dissenter.[6]

We do not reject the approach of the wife's expert solely because it does not accord with common sense, conflicts with the reasoned testimony of both the neutral expert and the husband's expert and is without precedential support, although these are collectively sufficient reasons to do so. Rather, there are other sound reasons to reject this "historical" approach. The approach of the wife's expert not only assumes that the assets will not be sold as of the valuation date, but also that WCI would operate in the future as it had in the past so that each year it both would sell assets to the same extent it annually had sold assets in the past and would be able to offset income generated by the sale of assets with the same deductions for salaries and other expenses that it had been able to take in prior years. The assumption that WCI would continue to be able to take the same deductions for salaries was at least brought into question by proceedings in Tax Court that were pending as of the trial. In that action, the Internal Revenue Service was challenging precisely those deductions, contending that they were excessive. For this very reason, Supreme Court recognized that the approach of the wife's expert "may be somewhat skewed in this case."

Furthermore, the assumption that WCI would sell assets in the future to the same extent that it had sold assets in the past is even more questionable. After all, Supreme Court ruled that the marital estate should be divided equally between the parties. Indisputably, given the size of the distributive award (which is payable over a period of years) and that Supreme Court distributed 88% of the other marital assets to the wife, the husband necessarily will have to sell assets of WCI every year to meet his distributive award obligations. Doing so, of course, will result in annual tax liabilities greater than those WCI historically had incurred.

Moreover, by also assuming that the securities owned by WCI will not depreciate in value over time, the approach of the wife's expert requires the husband to bear all the risk of a decline in their value. To the extent they do decline in value, the loss in value would not of course be offset dollar for dollar by a decrease in WCI's tax liability. To be sure, it is possible that the securi-

---

**6.** As noted below, Supreme Court recognized in its written decision a particular reason to regard as "somewhat skewed" the approach advocated by the wife's expert.

ties might appreciate. But the possibility that they might depreciate is of particular concern in this case. After all, because Supreme Court distributed 88% of all the other marital assets to the wife, the husband is left without any substantial cushion of assets to protect himself in the event the securities depreciated significantly. Accordingly, the consequences for the husband of the approach of the wife's expert could be calamitous.

By way of defending her expert's approach, the wife objects that Supreme Court determined not to grant prejudgment or postjudgment interest on the distributive award to her, and maintains that the effect of that determination is to reduce substantially the economic value of her 50% interest in the marital component of the appreciation in value of WCI. But that determination must be evaluated in light of the alternative. If Supreme Court had directed that this 50% interest be payable immediately, the wife would have received the full value of that interest on or about the date of the decree. The husband, however, would have been constrained to liquidate WCI, thus triggering the very tax liabilities that also would have substantially reduced the value of the wife's interest, unless the husband unfairly was required to pay all of the taxes. The economic effect of the determination that the distributive award should be payable over a period of years is that the husband, too, will not realize as of the date of the decree the full value of his 50% interest in the marital component of the appreciation in value of WCI. If the value of the securities owned by WCI depreciates over the period of years in which the distributive award is payable, the husband but not the wife will be adversely affected. An award of interest on the distributive award would have caused the husband to shoulder another significant burden, one that could result in additional disparate treatment of the husband. Even if the securities owned by WCI did not depreciate over that period of years, the husband but not the wife would be adversely affected to the extent that the appreciation in value of the securities was insufficient to offset the required interest payments. Finally, the wife has not provided us with any persuasive support for adopting the "historical" tax rate methodology propounded by her expert.

For all these reasons, we find only that as between the competing methodologies advanced by the parties at trial, under all the factual circumstances of this case Supreme Court should

have adopted the one accepted by the Fifth Circuit in *Dunn*.[7] Of course, our authority in this regard is as broad as that of Supreme Court (*Majauskas v Majauskas*, 61 NY2d 481, 493-494 [1984]). Accordingly, we conclude that Supreme Court overvalued WCI by $21,778,708 (the difference between the $7,793,292 reduction in value based on the "historical" tax rate methodology and the $29,572,000 reduction that would result under the methodology adopted in *Dunn*). That amount should be subtracted from the total value of WCI at the time of the commencement of this action found by Supreme Court ($74,387,630),[8] leaving a total value of $52,608,922.

Referring to the same treatise we cite, the dissenter relies on it in part, noting that "most courts that have faced this issue have not allowed a discount for trapped-in capital gains in a matrimonial context." But the cases cited in the treatise were decided before the Eleventh Circuit's decision in *Jelke*. In any event, counting the number of cases that have not allowed a dollar-for-dollar discount for embedded taxes is surely less illuminating than the reasoning of the cases. As the dissenter appears to recognize, the validity of the net asset valuation methodology adopted in *Jelke* and *Dunn* does not depend upon whether it is applied in an estate tax case, another type of tax case or a matrimonial action. Although we find persuasive the reasoning of the Fifth and Eleventh Circuits—the dissenter does not come to grips with the analysis of the majority in *Jelke* criticizing the methodology urged by the IRS—we conclude only that Supreme Court should have adopted the methodology of *Jelke* and *Dunn*, the one used by the neutral expert and the

7. Without explanation, the dissenter attributes to us a "recogni[tion]" that the valuation methodology adopted in *Dunn* and *Jelke* "may not be appropriate for matrimonial valuation." On the other hand, the dissenter recognizes that "although *Dunn* and *Jelke* are not matrimonial cases, the principles of taxation, capital gains and valuation are the same." In any event, even if we were of the view that the approach of the dissent in *Jelke* is more appropriate in a matrimonial action, we would not remand for what would amount to a new valuation trial. Compared to the approach the wife advocated at trial, we think both that the approach advocated by the husband is clearly more appropriate and that this protracted and bitterly contested action must come to an end.

8. This amount differs from the "baseline" value noted above of $70,848,107 because of other valuation adjustments made by Supreme Court. The husband does not dispute all of these adjustments. With respect to those he does dispute, we reject his contentions except to the extent indicated below. Accordingly, the discrepancy between the two "baseline" values is of no moment.

husband's expert, rather than the "historical" approach urged by the wife's expert.

Although we would disagree, we would understand if the dissenter believed that the appropriate resolution of this appeal was to adopt the approach of the IRS, the one adopted by the dissent in *Jelke*, and remand for a determination of the number of years over which the assets of WCI would be sold with the tax liability discounted to present value. We are at a loss to understand, however, why the dissenter expressly rejects not only the approach of the majority in *Jelke* but also implicitly rejects the approach of the dissent and the IRS (without explaining why).

The dissenter maintains that "unlike *Dunn* and *Jelke*, there is no indication that defendant's interest in WCI will cease or that WCI will cease operations with the entry of the decree." The dissenter is simply wrong in attempting to distinguish *Dunn* and *Jelke* on this ground. To be sure, as a result of the death of the decedent in *Jelke*, taxes were owed to the IRS (and, of course, the decedent's minority interest in the investment holding company ceased). But the amount of the taxes that were owed is a function of the value of the holding company itself. Accordingly, what was at issue in *Jelke* was the appropriate methodology for valuing the company itself. Just as the divorce in this case occasioned the need for valuing WCI, the death of the decedent in *Jelke* occasioned the need for valuing the investment holding company. Contrary to the dissenter's position, there is no indication at all in *Jelke* that the investment holding company was about to cease operations or sell the securities it owned. More importantly, the Eleventh Circuit's holding and analysis could not be clearer: in valuing an investment holding company under the net asset valuation methodology, whether or not the company actually will liquidate its assets (and perforce cease operations) is irrelevant (*Jelke*, 507 F3d at 1332 ["It is more logical and appropriate to value the shares of (the investment holding company) . . . based upon an *assumption* that a liquidation has occurred, without resort to present values or prophesies" (emphasis added)]).

In *Dunn*, the Tax Court found that the likelihood the closely-held corporation would be liquidated was "slight" (301 F3d at 356). The corporation, however, was an operating company, not an investment holding company like WCI and the corporation in *Jelke*, and the parties agreed that it should be valued on both an income-based approach and an asset-based approach (*id.* at

351). With respect to the asset-based approach, the Fifth Circuit could not have been clearer in holding that a dollar-for-dollar reduction for the built-in tax liability of the assets was required precisely because "the likelihood of liquidation is inapposite to the asset-based approach to valuation" (*id*. at 354; *see also id*. at 352 [criticizing the Tax Court for having followed the " 'no imminent liquidation' red herring" advanced by the IRS]). As the Fifth Circuit went on to explain, "the probability of a liquidation's occurring affects *only* . . . the relative *weights* to be assigned" to the separate values of the corporation determined under the asset-based and income-based approaches (*id*. at 354-355 [first emphasis added]).[9]

Two final aspects of the dissenter's position warrant a brief response. To the extent the dissenter means to suggest that the wife would have received a permanent maintenance award if Supreme Court had valued WCI in accordance with the approach of the neutral expert and the husband's expert, we make two points. First, Supreme Court declined to award permanent maintenance in part because the wife would be "vastly wealthy in her own right." As noted below, however, because the wife did not perfect her cross appeal, we have no occasion to decide whether a permanent maintenance award would be appropriate in light of our reduction of the distributive award. Assuming it might be warranted, the fault lies not in our disposition of the arguments raised by the husband on his appeal. Second, without deciding the issue, in light of the dissenter's suggestion we note that even putting aside the considerable but reduced distributive award payments, Supreme Court awarded the wife over $27 million in assets, reflecting approximately 88% of the other marital assets. It is far from obvious that Supreme Court or anyone would have regarded the award of $27 million in assets as insufficient to render the wife "vastly wealthy in her own right."

## II

A related issue stems from the husband's contention at trial that was espoused by his expert, but not the neutral expert, that the value of WCI also should be reduced by the non-tax costs of liquidating the corporation. Notably, the parties do not alert us to any testimony from the neutral expert explaining his apparent belief that no such reduction is appropriate. On ap-

---

**9.** Here, there is no dispute that by the time of trial WCI was only an investment holding company.

peal, the husband argues that, consistent with the approach adopted in *Dunn*, pursuant to which the hypothetical buyer is assumed to liquidate the assets of the corporation upon acquiring it, an additional reduction in value is warranted to account for the non-tax costs of liquidating the corporation that the buyer would incur. The husband's expert computed those costs by assuming that WCI's assets would be liquidated over a six-month period after the valuation date (the date the action was commenced), an assumption that results in higher non-tax liquidation costs than would be incurred if the assets were liquidated on the date of commencement. Although the parties do not discuss the issue, the assumption by the husband's expert of a six-month liquidation period is not consistent with the assumption, for purposes of determining the extent of the reduction for embedded taxes, that the corporation's assets are liquidated on the valuation date.

The wife urges that the husband's expert overstated the operating costs, understated liquidation costs and ignored the net income that would be generated if WCI were not liquidated. In addition, the wife argues with considerable force that it makes no sense to conclude that a hypothetical purchaser who has the cash to purchase WCI would buy it only to liquidate it and generate the cash that the buyer already has on hand.[10] Supreme Court held that no such reduction in the value of WCI was appropriate.

Supreme Court stated that it was "not persuaded that liquidation is WCI's highest and best use," and concluded both that the husband's "projection of liquidation versus operating expenses . . . is skewed" and that in any event "there is no basis to conclude that it is more profitable to shut WCI down than to continue to operate it." Consistent with this latter conclusion, Supreme Court did not make any specific findings on what the non-tax liquidation costs of WCI would be.

In his briefs on appeal, the husband argues not only, albeit in passing, that a reduction in value for the non-tax costs of liquidating WCI is inherent in the net asset valuation approach adopted by the Fifth Circuit, but also hedges on that argument by contending that it is reasonable to conclude on the particular

---

**10.** We recognize that the same objection could be raised with respect to the methodology adopted by the Fifth and Eleventh Circuits pursuant to which the value of the corporation is reduced by the full amount of embedded taxes on the assumption that the hypothetical buyer contemporaneously liquidates the corporation's assets.

facts of this case (including factual developments that occurred after the trial) that a buyer of WCI would liquidate its assets over a six-month period. At trial, the husband's expert testified, consistent with the report submitted by his firm, that a willing buyer would be more likely to liquidate WCI "considering the level of expenses in relation . . . to income." We are unable to determine on the present record whether the husband argued in his post-trial brief that as a matter of law a reduction in value for the non-tax liquidation costs always is required under the net asset valuation methodology adopted by the Fifth Circuit.[11] The wife, however, does not contend that the husband failed to preserve this argument for our review.

Determining whether and the extent to which a reduction in value for non-tax liquidation costs is warranted is complicated further by the parties' contentions about those costs. Although the husband contends in his brief that his expert determined that the liquidation costs would be approximately $4.4 million, the husband cites only to the page of Supreme Court's written opinion in which Supreme Court stated that the husband's expert reduced WCI's value by that amount on account of the non-tax liquidation expenses. In fact, the report submitted by the husband's expert concluded that these expenses would be about $4.4 million on a pre-tax basis or $2.6 million after taxes and that "a rational seller of WCI would agree to reduce the purchase price by about $2.5 million." In her brief, the wife correctly notes that the husband's expert posited an after-tax cost of some $2.5 million but, as noted above, contends that the

---

**11.** In *Dunn,* the Fifth Circuit did not address the issue of whether a reduction in value for non-tax liquidation costs also is required. Although such a reduction might appear to be entailed by the valuation methodology adopted by the Fifth Circuit, the issue may not have been raised by the parties. Nor did the Eleventh Circuit address the issue in *Jelke,* although the Eleventh Circuit did observe that the Fifth Circuit had "held, as a matter of law, that, *as a threshold assumption,* liquidation must always be assumed when calculating an asset under the net asset value approach" (*Jelke,* 507 F3d at 1328 [footnote omitted]). Again, however, the issue may not have been raised in *Jelke.* We note, too, that the corporation in *Jelke* was not, like the corporation in *Dunn,* both an operating and an investment company (*Jelke,* 507 F3d at 1332). Rather, much like WCI, the corporation was a closely-held investment holding company owning appreciated, marketable securities (*id.*). It is conceivable, accordingly, that the non-tax liquidation costs of the corporation in *Jelke* were de minimis; by contrast, at least some of the securities owned by WCI were not readily marketable. Another possibility is that the parties in both *Dunn* and *Jelke* were of the view that no reduction in value on account of the non-tax liquidation costs was appropriate.

husband's expert *understated* these liquidation costs by as much as $5 million.[12]

We are confronted with other complications that the parties do not discuss. First, although a hypothetical buyer of WCI could avoid all taxes embedded in the unrelated appreciation of the securities owned by WCI by purchasing the same securities in the market, it seems plain that the hypothetical buyer could not avoid all the costs of liquidating the securities, whenever that would occur, by purchasing the same securities in the market. Surely a buyer of securities in the market cannot reasonably hope to persuade the seller to accept less than the fair market value of the securities on the ground that the buyer will incur costs when the securities are sold. Thus, although a purchaser of securities need not be saddled with the seller's basis, incurring costs when securities are sold is a necessary incident of ownership. On this record, suffice it to say, we cannot determine the extent to which the husband's expert included costs in the posited non-tax liquidation costs other than those necessarily incident to owning the securities. Second, the securities owned by WCI could generate revenues during the six-month liquidation period that would offset at least in part the non-tax liquidation costs. The husband's expert, however, appears not to have accounted for any such revenues.

In another case we might request supplemental briefs from the parties and, to the extent that we concluded that factual issues remained that we could not resolve, remand to Supreme Court. Given the passage of more than seven years since the commencement of this action and the enormous litigation costs incurred by the parties, as well as the possibility of both another, albeit more limited, fact-finding proceeding and another appeal, we think the only sensible course of action is to decide this issue on the existing record and despite the failures of the parties to address the subsidiary issues noted above (*cf. Dunn*, 301 F3d at 358). For two reasons we conclude that the value of WCI should not be reduced by any non-tax liquidation costs.

---

**12.** This contention by the wife is a two-edged sword. If we accept her argument that a reduction for non-tax liquidation costs is warranted only if it is likely that a hypothetical buyer would liquidate WCI, her position is strengthened if, as she maintains, the husband's expert overstated WCI's operating costs and understated both its net revenues and liquidation costs. On the other hand, if we accept the husband's argument that as a matter of law the net asset valuation methodology always requires such a reduction, a greater reduction in the value of WCI (and thus of the marital estate in which the wife is to share) would be necessary.

First, we have no rational basis for determining what the amount of the non-tax liquidation costs is, assuming that we were to hold that the value of WCI should be reduced by some such costs. Second, we think that the amount of any of the costs we might recognize is small relative to the overall value of the marital property and might not exceed the costs of additional briefing and the possible fact-finding proceeding. We hasten to add what should be obvious: our resolution of this issue sets no precedent on the question of whether or the extent to which a reduction in value for non-tax liquidation costs is appropriate in other circumstances.

### III

██ The husband also argues, and we agree, that Supreme Court erred in concluding that his right pursuant to a subscription agreement to purchase additional shares of the common stock of WCI's predecessor entity at a price of $4,900 per share, a right that when exercised entitled him to 12 additional shares of preferred stock for each share of common stock, was not his separate property. The subscription agreement was entered into prior to the marriage and, as amended prior to the marriage, entitled the husband to purchase 10 additional shares of common stock and thereby acquire 120 shares of preferred. Prior to the marriage, the husband purchased pursuant to the subscription agreement 2.65 shares of the common stock, thereby also acquiring 31.8 shares of preferred. Supreme Court concluded, and the wife does not contend otherwise, that these shares and fractional shares constitute separate property of the husband. The remaining 7.35 shares of common stock, and the attendant 88.2 shares of preferred, were paid for and acquired during the marriage. Because marital property is defined to include "all property acquired by either or both spouses during the marriage" (Domestic Relations Law § 236 [B] [1] [c]), Supreme Court concluded that these shares were marital property.

The flaw in Supreme Court's reasoning is that it does not recognize that, especially given the broad meaning of the term property in the Domestic Relations Law (see O'Brien v O'Brien, 66 NY2d 576, 583-584 [1985]), the husband's right to acquire the 7.35 shares of common stock and 88.2 shares of preferred is itself property that he acquired before the marriage. The neutral expert and the husband's expert agreed that at the time of the commencement of the marriage the husband's right to acquire the shares was tantamount to an "in-the-money option" as the

purchase price of the shares was far below their fair market value. Thus, although the husband does not contend on appeal that Supreme Court erred in concluding that the appreciation in value during the marriage of these shares of common stock is marital property, he correctly contends that he is entitled to a credit in the amount of the value as of the date of the marriage of his right to acquire the additional shares of stock pursuant to the subscription agreement.

Using the values Supreme Court adopted for the common and preferred shares of the predecessor entity as of the date of marriage ($22,176.51 per share of common stock and $791.63 per share of preferred), the value of the 7.35 shares of common stock and the 88.2 shares of preferred, assuming the right was exercised as of the date of marriage, is approximately $232,800. Consistent with the approach of the neutral expert and the husband's expert in valuing the husband's right as of the date of the marriage to acquire the shares pursuant to the subscription agreement, the value of that right is approximately $196,800 ($232,800 minus the approximately $36,000 purchase price of the 7.35 shares of common stock).[13]

In point VIII of his brief, the husband advances a confusing claim that Supreme Court "erred in failing to hold that [his] preferred shares were passive assets." He maintains that the preferred shares are redeemable only at their stated par value plus their accumulated unpaid dividends and that for this reason their value could not be affected by his actions. Supreme

13. We reject both the wife's claim that the husband raised on appeal for the first time his argument that Supreme Court failed to account for the value of his subscription rights and thus that it is not preserved for our review, as well as her claim that there is no evidence in the trial record that the husband attempted to value those rights. As to the first claim, the wife merely asserts it without referring us to the parties' post-trial briefs (which are not before us, with the exception of a few pages excerpted from the husband's brief that were included in the record on appeal) or to anything else in the voluminous trial record. Although the husband counters that he did press this argument before Supreme Court, he similarly fails to direct our attention to any portion of the trial record or to his post-trial brief. The husband, however, does correctly note that Supreme Court ruled on the issue of whether the 7.35 shares of common and the 88.2 shares of preferred were the husband's separate property. Indeed, Supreme Court stated that it "rejects the argument that such shares . . . constitute separate premarital property." Moreover, the reports of the neutral expert and the husband's expert, both of which were in evidence, considered and valued these shares as though they were beneficially owned by the husband. The wife's second claim is refuted by the reports of the neutral expert and the husband's expert, and by the testimony given by the representatives of both experts who testified at trial.

Court's error, according to the husband, extends not only to the preferred shares he owned prior to the marriage but also to the preferred and common shares he acquired under the terms of a shareholders' agreement providing that upon the death of a shareholder WCI was required to repurchase the shareholder's preferred shares at their redemption price and the shareholder's common shares at book value. He urges that Supreme Court should not have regarded these preferred and common shares as marital property. Apart from merely citing to the shareholders' agreement, the husband does not otherwise cite to anything in the record indicating either that he raised this claim or that it was addressed by any of the experts in their reports or their testimony. Moreover, we are left to scour the record on our own to quantify the principal and the alternative relief the husband seeks on account of this claim.

In response, the wife contends that the husband raises this claim for the first time on appeal, and also asserts that the husband's brief does not contain a single reference to the record supporting the claim because he never presented any evidence bearing on it at trial. In his reply brief, the husband does not mention either this claim or the wife's contentions that it is not preserved for review, that no evidence was presented in support of it and that it is without merit as the preferred shares are not a passive asset because they represent an interest in a business actively managed by the husband.

Even assuming the husband has not abandoned this argument, we need not come to grips with it on the merits. We conclude that it is in any event not preserved for appellate review.

## IV

The husband's main brief claims two other valuation errors by Supreme Court: (1) that an alleged accrued bonus owed to him by WCI should have been deducted from the value of WCI as of the commencement date of the action; and (2) that Supreme Court erroneously included in the value of WCI both the value of certain securities that were sold prior to the commencement date of the action but which did not settle until after that date, and the amount of the receivable owed to WCI on account of the sale of the same securities. In his reply brief, however, the husband does not mention either of these arguments let alone address the wife's arguments that Supreme Court did not err in either respect.

To the extent the bonus was a legal obligation of WCI, as the husband maintains, even assuming it should have been deducted from the value of WCI, the wife would share equally in the value of the enforceable right to receive it as that right would constitute marital property.[14] As for the alleged double-counting, Supreme Court merely included in the value of WCI the after-tax value of the proceeds of the sale of the securities to rectify the failure of the neutral expert and the husband's expert to account for either the value of the securities or the proceeds of the sale. For these and other reasons, we reject—with one qualification—both of these claims of error.

The qualification is that Supreme Court determined the after-tax value of the proceeds of the securities sold by using the 11% "historical" rate. Thus, Supreme Court reduced the amount of the proceeds ($506,477.51) by 11% ($55,712.53), and increased the value of WCI by the remainder ($450,764.98). Consistent with our rejection of this "historical" rate, we reduce the amount of the proceeds by 41.74% ($211,403.71). Accordingly, Supreme Court's valuation of WCI should be reduced by $155,691.18 (the difference between the reduction for the taxes made by Supreme Court and the reduction for taxes that should have been made).

## V

The husband argues that he is entitled to a credit of $3,124,330 against the distributive award for interim counsel and expert fees he paid on behalf of the wife. The record on appeal, however, does not include an order adjudicating adversely to the husband a motion for reallocation of the interim counsel and expert fee awards awarded pendente lite. In essence, the husband's contention is that there should have been an order reallocating the interim fee awards and that Supreme Court wrongfully deprived him of the opportunity to make a motion for that relief that could have been adjudicated prior to the entry of judgment.

Thus, in his main brief the husband claims that Supreme Court erred when, as the trial was ending, it advised the par-

---

**14.** Our resolution of this issue assumes what is improbable: that the after-tax consequences of deducting the bonus from the value of WCI do not differ from the after-tax consequences of treating the bonus as earned income to be split equally between the parties. The parties, however, do not address this subject and we could not on this record determine what the different tax consequences would be. Moreover, given the size of the marital estate, we think it likely that the extent of the differential tax consequences would not be significant.

ties, in response to an inquiry on the subject by the wife's attorney, that it was severing the issue of reallocation of the interim fee awards. Supreme Court went on to inform the parties that any motions on the issue should be made after it issued its decision and order resolving the trial issues and that any such motion would be referred to another justice. This oral ruling was incorporated in Supreme Court's written decision and order. Thereafter, in accordance with the oral ruling and the written decision and order, the husband moved for an order reallocating the expert, counsel and other fees he paid on the wife's behalf. In his moving papers, the husband noted that the motion was to be referred to another justice and did not protest. The motion was referred to another justice, and we are informed by the parties that this justice determined that the reallocation issue should be deferred until the appeal was decided. The record on appeal, however, does not include any written order to that effect or the transcript of a proceeding reflecting that determination.

Notwithstanding that the husband both filed the motion knowing that it would be referred to another justice and voiced no objection, the husband now claims that Supreme Court should not have severed the issue because of the court's extensive knowledge of the case. The result of severing the issue, the husband further complains, is that whatever decision is made by the justice to whom the matter was referred will be subject to a separate appeal to this Court that would compound the parties' costs and burden this Court.

We reject this claim. When Supreme Court advised the parties that it was severing the issue and that it would be referred to another justice, the husband voiced no objection. Accordingly, as the wife correctly observes, this claim is not preserved for appellate review (*Jimenez v Regan*, 248 AD2d 510 [1998]). Indeed, the husband waived it when he moved for an order reallocating the fees with knowledge that it would be referred to another justice (cf. *Lieblich v Solomon*, 7 AD2d 638 [1958]). Moreover, as is true of other of the husband's claims of error by Supreme Court, in his reply brief the husband does not mention this claim and does not mention let alone address any of the wife's arguments in response, including her contention that it is not preserved for review. Particularly given that Supreme Court had no occasion to explain its decision to sever the issue and refer it to another justice, we cannot perceive any error in that decision. In addition, the record before us is

completely inadequate to permit review of the husband's conten- tion that the wife is not entitled to any fee award and he is entitled to a credit of over $3 million. We cannot resolve, for example, whether the appellate contention of the husband or the wife about the amount of the interim fees he paid is cor- rect.[15] To the extent the husband is arguing that the equal dis- tribution of the marital property alone is a sufficient basis for determining that the wife is not entitled to any fee award, that argument should be considered by the justice before whom the matter is pending.

## VI

As noted above, in part because of its conclusion that the wife would be "vastly wealthy in her own right" as a result of the equal distribution of the marital assets, Supreme Court denied the wife's request for permanent maintenance. However, Supreme Court awarded conditional, durational maintenance to the wife, with the husband being obligated both to make monthly payments of $46,666 to the wife, a portion of which is deductible by the husband, and to pay various expenses, includ- ing the mortgage payments and taxes relating to the home awarded to the wife. Pursuant to the terms of the judgment, this maintenance award continues until the wife receives both the specific assets awarded to her and the first payment on ac- count of the distributive award (an award we discuss below).

Relying on our decisions in *Gad v Gad* (283 AD2d 200 [2001]) and *Pickard v Pickard* (33 AD3d 202 [2006], *appeal dismissed* 7 NY3d 897 [2006]), the husband argues that because Supreme Court did not make a permanent maintenance award he is entitled to a credit against the distributive award in the amount of all the temporary maintenance payments he made. The husband contends that he paid a total of $3,000,987 in tempo- rary maintenance. The wife argues that the husband is not entitled to any credit and disputes the husband's claim that he in fact paid over $3 million in temporary maintenance.

---

**15.** In his motion, the husband sought a credit against the equitable distri- bution award of $1,562,165, an amount that, according to his attorney, consisted of $1.4 million in legal and accounting fees paid on the wife's behalf, plus $162,165 representing one half of other fees paid on his and the wife's behalf (including the fees paid to the neutral expert). There is no statement or suggestion in his attorney's affirmation that the $1.4 million figure reflects only half of the legal and accounting fees the husband assertedly paid on the wife's behalf. The husband offers no explanation in his brief for the fact that he asks this Court to award him a credit exactly double the amount of the credit he seeks in his motion.

■ We agree with the wife that the husband's reliance on *Gad* and *Pickard* is misplaced and that he is not entitled to any credit for the temporary maintenance payments he made, regardless of the amount of those payments. The mere determination by Supreme Court not to award permanent maintenance cannot be equated with a finding that the pendente lite maintenance award was excessive. Supreme Court did not make such a finding either expressly or implicitly. To the contrary, as is clear from Supreme Court's written decision, the determination not to award permanent maintenance was based in part on the ground that permanent maintenance was unnecessary given the wife's vastly different economic circumstances as a result of the equal distribution of the marital property. In addition, Supreme Court also based this determination on the consequences of the distribution of the overwhelming preponderance of the liquid marital assets to the wife. As a result, a permanent maintenance award would have required the husband to tap into the income generated by WCI or liquidate securities it owned even though he was awarded this asset. Accordingly, Supreme Court cogently observed that an award of permanent maintenance would entail an element of "double dipping" by the wife into the principal asset awarded to the husband. In light of our conclusion that the husband is not entitled to a credit simply because Supreme Court did not award permanent maintenance, we need not resolve the parties' competing contentions about whether the record is adequate to determine the amount of the temporary maintenance payments. To the extent the husband asserts that we should find the pendente lite maintenance award excessive, we find that assertion unpersuasive.[16]

## VII

In determining the date-of-commencement value of the marital interest in WCI, Supreme Court found that the value of the husband's separate property interest in the predecessor entity as of the date of the marriage in 1971 was $646,271. The parties do not now take issue with this finding or with either Supreme Court's conclusion that the common and preferred stock of the

---

16. Conceivably, Supreme Court might have awarded permanent maintenance to the wife if it had valued WCI in accordance with the methodology adopted in *Dunn.* As noted earlier, however, the wife does not ask us to accord her any relief relating to permanent maintenance in the event we were to accept the husband's argument concerning the extent of the appropriate deduction for embedded taxes. Because she has not cross-appealed, we could not in any event grant such relief to her (*Kay v Kay,* 302 AD2d 711, 714 [2003]).

predecessor entity that the husband inherited in 1986 upon his father's death was his separate property, or Supreme Court's finding that the value of the inherited stock in 1986 was $3,523,904.80. Because the inherited stock, coupled with the stock the husband already owned prior to his father's death, constituted a controlling block, Supreme Court found that the value of the common stock the husband owned prior to the inheritance should be increased by 35% (or $752,769.36) to eliminate the discount in the value of those shares attributable to the fact that they constituted only a minority interest. The parties do not dispute this finding or Supreme Court's conclusion that this 35% increase in value represented "passive appreciation" that was the husband's separate property. With respect to the preferred stock the husband owned prior to the inheritance, Supreme Court found for similar reasons that its value increased by $201,707.71 as a result of the inheritance. The parties do not dispute this finding by Supreme Court or its conclusion that this increase in the value of the preferred shares represented "passive appreciation" that was the husband's separate property.[17]

Accordingly, we find that the date-of-commencement value of the marital interest in WCI is $47,131,777.95—$52,608,922 minus the sum of the adjusted, after-tax value of the proceeds of the securities sold prior to the commencement date ($155,691.18), the value of the husband's property interest in WCI as of the date of the marriage ($646,271), the value of the husband's subscription right ($196,800), the value of the common and preferred stock he inherited from his father ($3,523,904.80) and the amount of the increase in value of the husband's equity interest at the time of the inheritance stemming from the controlling interest in the corporation acquired as a result of the inheritance ($954,477.07).

## VIII

With respect to the other marital assets, including securities (virtually all of which were in the husband's name), cash accounts, a home and an apartment, Supreme Court valued them at $30,548,556. Except for his contention, discussed below, that Supreme Court erred in valuing the securities as of the date of

---

**17.** The husband does not contend that Supreme Court erroneously failed to include as his separate property the increase in value of the common and preferred stock acquired pursuant to the subscription agreement stemming from the inherited stock.

commencement and the cash as of the date of trial, the husband does not contest Supreme Court's valuation of the other marital assets.

After considering the statutory factors (Domestic Relations Law § 236 [B] [5] [d]), Supreme Court determined that the parties should share equally in all of the marital assets. The husband does not now contest this determination. Given its conclusion that the husband should retain his ownership of WCI, Supreme Court was constrained to award to the wife approximately 88% of the other marital assets, collectively valued at $27,135,154.. The husband was awarded his Colorado residence (valued at $1.95 million) and, to provide him with "some liquid cash assets," certain securities Supreme Court had valued at $1,463,422.

The result of these discrete awards was a deficiency in the wife's share of the assets of $22,770,623 ($49,905,767, one half of the total value of $99,811,533 that Supreme Court assigned to the marital assets, minus $27,135,154, the value of the specific marital assets awarded to the wife). Accordingly, Supreme Court granted a distributive award to the wife in the amount of the deficiency, and directed that the husband pay the award over a period of 15 years, with annual payments of $1,518,042 payable in quarterly installments of $379,510.50. Supreme Court did not grant prejudgment or postjudgment interest on the distributive award to the wife, but ruled that interest would accrue in the event and to the extent of a default in any of the required payments.[18]

Contrary to the husband's contention, Supreme Court did not err in valuing the parties' cash accounts as of the date of trial. As of the date of commencement of the action, the wife had cash accounts in the amount of $3,023,424, which had dwindled to $297,047, a decrease of $2,726,337, by the time of trial. According to the husband, by valuing the wife's cash accounts as of the date of trial, Supreme Court erroneously relieved the wife

---

18. The wife maintains that Supreme Court erred in declining to award prejudgment and postjudgment interest and that the economic effect of not awarding postjudgment interest is a diminution in the value of the distributive award of nearly $9 million. The wife, however, withdrew her cross appeal and we may not review this or any of the other claims for affirmative relief that she raises in her brief (*Kay v Kay*, 302 AD2d at 714).

of any obligation to account for the $2,726,377 she apparently spent between the date of commencement and the date of trial.[19]

We reject the husband's claim that he is entitled to a credit against the distributive award in the amount of one half of the decline in value of the wife's cash accounts. As the wife notes, Supreme Court also found that between the date of commencement and the date of trial, the husband's cash accounts had declined by $2,781,086 (from $4,170,253 to $1,389,167). The husband does not dispute this finding. Nor does he address Supreme Court's implicit conclusion that it mattered little which date was used given that the difference between the decline in value of the parties' cash accounts was relatively minor. Moreover, defendant was the one who spent more from his cash accounts and he was similarly relieved of any obligation to account for the $2,781,086 decline in the value of his cash accounts. Supreme Court further observed, and the husband does not dispute, that there was "no evidence establishing exactly what happened to the monies each party had in his or her possession while the case was pending."

■ The husband's argument that the securities of WCI (and thus WCI itself) and the other securities he owned or controlled should have been valued as of the date of trial also is without merit. While some "courts have concluded that 'active' assets should be valued only as of the date of the commencement of the action, while the valuation date for 'passive' assets may be determined more flexibly," these "formulations" are but "helpful guideposts" and not "immutable rules of law" (*McSparron v McSparron*, 87 NY2d 275, 287, 288 [1995]). Thus, although securities commonly are " 'passive' assets" that are valued at the date of trial as they may "change in value suddenly based on market fluctuations" (*Grunfeld v Grunfeld*, 94 NY2d 696, 707 [2000]), they may be active assets when, as here, they are actively managed by the titled spouse (*Ferraioli v Ferraioli*, 295 AD2d 268, 270 [2002]).

Apart from finding what is undisputed, that the securities owned by WCI and by the husband required his "specialized knowledge in order to be appropriately invested," Supreme Court's conclusion that the securities should be valued as of the date of commencement was appropriate for another reason. In rejecting the husband's claim that the securities should be valued as of the date of trial, Supreme Court stressed that:

---

19. Supreme Court found that the decline in value was $2,726,377; the husband asserts that the decline was $2,698,402.

"The parties, by their actions throughout prior proceedings herein, charted a course of litigation that accepted a [date of commencement] valuation of WCI . . . When this trial began defendant agreed, by words and deeds, that the court should utilize a [date-of-commencement] valuation. Thus, when, during discovery, [the wife] demanded up to date financial information about WCI, defendant refused to produce such information arguing that it was irrelevant to a [date-of-commencement] valuation."

All of the experts, moreover, adopted a date-of-commencement valuation date. And, as Supreme Court also observed—and the husband also does not dispute—"[o]nly toward the close of the evidence on WCI's valuation did the husband advance his contention that the court should utilize a trial date valuation."

## IX

Having disposed of all the husband's claims regarding the value of the marital property and for various credits against the distributive award, we turn to the modifications to the distributive award that are required by our findings and conclusions of law. As is evident, the overvaluation of WCI has significant consequences for the distributive award. Under our analysis, and using the same valuation dates adopted by Supreme Court, the total value of the marital property is $77,680,333.95 ($47,131,777.95 plus $30,548,556), and thus each party's share is $38,840,167. We are not unmindful of the husband's protest that Supreme Court's distribution to the wife of 88%, $27,135,154, of the more or less liquid assets—the marital property other than the marital component of WCI—is inequitable. The burden of this distribution of those assets, however, is mitigated by the substantial reduction in the distributive award. In addition, as is discussed below, it appears that the husband sold some of the securities in his name after commencement of the action and before Supreme Court's decision and order resolving the trial issues. We do not know, however, which securities were sold. Moreover, any redistribution of the liquid assets would require a correlative increase in the distributive award. The economic value of any such increase, however, would be reduced by virtue of the fact that interest does not accrue on the distributive award.

For these reasons, we decline to disturb Supreme Court's allocation of the marital assets other than the marital component of WCI. Accordingly, a distributive award of $11,705,013

($38,840,167 minus $27,135,154) is necessary to effectuate the equal division of the marital property. In accordance with the payment terms fixed by Supreme Court, the $11,705,013 distributive award is payable over a period of 15 years, with quarterly payments of $195,083.55.

## X

One last issue, and a ministerial matter, remain to be discussed. During the pendency of this action, the wife sought an injunction preventing the husband from selling or transferring the securities in his control. That application was denied. As the husband argues, he thus was free to sell securities he controlled on the date of commencement. In his brief, the husband states that he did sell some of those securities and purchased others, paying taxes on the gains realized on the sale of the securities he sold. In her brief, the wife does not challenge these statements by the husband in his brief or argue that we should ignore them as dehors the record.

A problem arises because the written decision and order direct that the husband transfer to the wife all of the securities owned or controlled by the husband (other than those owned by WCI) and listed in the decision and order along with their date-of-commencement market value. Indeed, the decision expressly notes that by crediting against the distributive award the full value of the securities as of the date of commencement, "the risks of gains and/or losses since the valuation date [were passed] over to [the wife]." Even assuming that there is some ambiguity in the relevant terms of the judgment on this score, the decision controls (*Madison III Assoc. Ltd. Partnership v Brock*, 258 AD2d 355 [1999]).

With respect to any of the securities the husband sold while he was free to do so after the wife's motion for an injunction was denied, the husband argues that he is required to provide the wife with "the proceeds of re-investment less the costs of the sale, taxes and reinvestment."[20] The wife argues simply that the husband is required to transfer to her the assets acquired with the sale proceeds. Although the husband suggests in his

---

**20.** By "proceeds of re-investment," we understand the husband to refer to the actual asset or assets acquired with the cash generated by the sale. To the extent any securities were sold and the cash was not reinvested in another security or other asset, the husband argues that he is required to transfer to the wife the cash proceeds plus either the actual interest earned or imputed interest if none was earned, less the costs of the sale including any taxes paid by the husband.

main brief that the wife does so argue, we do not understand the wife to argue that the husband is required to transfer to her a sum of money equivalent to the date-of-commencement market value of the securities sold. The dispute between the parties on this score, accordingly, reduces to whether the husband is entitled to a credit against the distributive award in the amount of the costs he incurred, including taxes he paid, in selling and reinvesting the securities sold.

■ We conclude that it would be inequitable not to grant the husband such a credit given that he was free to sell the securities during the pendency of the action.[21] Accordingly, we unfortunately must direct a hearing to determine which securities the husband sold, what he did with the proceeds, what costs he incurred and the amount of the resulting credit to which he may be entitled. However, we direct that the hearing take place as expeditiously as possible and, in the event of another appeal, encourage either party to move this Court for an order expediting the appeal.

As noted earlier, during the pendency of this action, the Internal Revenue Service asserted a tax deficiency against WCI for having deducted during various tax years excess compensation that it had paid to the parties. An action thereafter was commenced in Tax Court. As of the time of Supreme Court's written decision and order, the tax proceeding was fully tried and sub judice. Supreme Court concluded in its decision and order that in the event of a final adjudication of tax liability against WCI on account of excess compensation that it had paid to the parties during the years they were married, it would be inequitable not to require the wife to share in that liability. Supreme Court determined that the wife's share of the potential liability was 46.7%, which it computed by dividing 50% of the date-of-commencement value of the marital interest in WCI by the full date-of-commencement value of WCI. Because the extent of the liability was unknown, Supreme Court determined that after the final adjudication of the tax proceeding, either party was permitted to "apply to the court for further direction on

---

**21.** Whether the husband sold any of the securities after the date of Supreme Court's written decision and order but before the judgment is a matter about which we are not advised. Nor do the parties address the issue of whether the husband remained free to sell the securities during that period. Accordingly, we express no opinion regarding whether the credit the husband is entitled to would be affected in the event such sales occurred. Similarly, we express no opinion on that issue in the event the husband sold any of the securities after the judgment was entered.

how the [wife] shall pay her share of the tax liability." The judgment incorporates this determination, and the husband does not contend that Supreme Court erred in computing the wife's share of the tax liability.

After the judgment was entered but before this appeal was perfected, the proceeding in Tax Court was decided (*Wechsler & Co., Inc. v Commissioner of Internal Revenue*, TC Memo 2006-173 [2006]). The husband maintains in his brief, and the wife does not dispute, that as a result of the Tax Court decision, WCI faces a tax liability to the federal government and to New York State for as much as $19,000,000. We do not know whether any final judgment of liability has been entered against WCI or whether, if a final judgment has been entered, an application has been made in Supreme Court with respect to the payment by the wife of her share of the liability. We simply observe that in the event no such application has been made and resolved, our reduction in the date-of-commencement value of the marital interest in WCI would entail a reduction of the wife's proportionate share of the tax liability, from 46.7% to 44.8% (50% of $47,131,777.95 divided by $52,608,922).

To the extent we have not expressly or implicitly addressed all the husband's arguments for affirmative relief, we find them unavailing.

Accordingly, the judgment of Supreme Court, New York County (Judith J. Gische, J.), entered February 3, 2006, inter alia, equitably distributing marital property, should be modified, on the law and the facts, the provisions thereof (1) reducing the baseline value of WCI by $7,793,292 pursuant to the "historical" rate of annual taxes paid by WCI, (2) determining that the husband's right pursuant to a subscription agreement to purchase additional shares of stock in WCI's predecessor was not his separate property, (3) reducing by $55,712.53 the after-tax value of the proceeds of the securities sold prior to the commencement date of the action but not settled until after that date, (4) determining that the marital interest in WCI is $69,262,977, (5) determining that the value of the marital estate is $99,811,533, (6) directing the husband to pay the wife a distributive award of $22,770,623, payable in quarterly installments of $379,510.50, and (7) determining that the wife's share of the tax liability of WCI is 46.7%, should be vacated and replaced by provisions (1) reducing the baseline value of WCI by $29,572,000 pursuant to the approach of the neutral expert and the husband's expert, (2) determining that the husband's right

pursuant to a subscription agreement to purchase additional shares of stock in WCI's predecessor was his separate property and reducing the baseline value of WCI by the value of that right, $196,800, (3) reducing by $211,403.71 the after-tax value of the proceeds of the securities sold prior to the commencement date of the action but not settled until after that date, (4) determining that the marital interest in WCI is $47,131,777.95, (5) determining that the value of the marital estate is $77,680,333.95, (6) directing the husband to pay the wife a distributive award of $11,705,013, payable in quarterly installments of $195,083.55, and (7) determining that the wife's share of the tax liability of WCI is 44.8%, and otherwise affirmed, without costs, and the matter remanded to Supreme Court both for a hearing to determine which securities the husband sold, what he did with the proceeds, what costs he incurred selling and reinvesting securities and the amount of the resulting credit to which he is entitled against the distributive award and, following that hearing and a determination of the amount of the credit, entry of an amended judgment consistent with this opinion.

Motion seeking leave to reargue stay pending determination of this appeal dismissed as moot.

SWEENY, J. (dissenting in part). I agree with the majority on all but one point. I cannot agree that a discount for "trapped-in capital gains" should be applied in arriving at a value of Wechsler & Co., Inc. (WCI), defendant's closely held subchapter C corporation. The Dunn[1] and Jelke[2] valuation methodology used by the majority recognizes the trapped-in capital gains discount for C corporations and applies dollar-for-dollar discount for such capital gains in arriving at a value for estate tax purposes. I also appreciate that the IRS has taken the position that a discount for built-in capital gains tax liabilities could be applied when valuing a closely-held stock, depending on the facts presented in each case (Announcement Relating to Eisenberg, 1999-4 IRB 4 [1999]). Depending on the facts, the IRS applies this discount whether the corporation under consideration is going to continue in business or whether it is winding up its operations.

As the majority recognizes, this valuation methodology, which

---

1. *Dunn v Commissioner of Internal Revenue*, 301 F3d 339 (5th Cir 2002).

2. *Estate of Jelke v Commissioner of Internal Revenue*, 507 F3d 1317 (11th Cir 2007).

arose out of valuations for estate tax purposes, may not be appropriate for matrimonial valuation purposes. In fact, as the majority notes, although Tax Court decisions are generally followed in the family law arena, most courts that have faced this issue have not allowed a discount for trapped-in capital gains in a matrimonial context (*see generally* Shannon P. Pratt et al., Valuing a Business: The Analysis and Appraisal of Closely Held Companies, at 463-464 [5th ed 2008]). An analysis of the cases cited therein shows that the courts in other jurisdictions have looked at the facts of each case, and where the tax consequences are immediate and arise as a result of the decree, or within an ascertainable time that is neither hypothetical nor imaginary,[3] the tax consequences of the trapped-in capital gains must be taken into account. However, where there is no indication that the party will be selling the property or the party's interest in the property will continue, the dollar-for-dollar discount for trapped-in capital gains methodology may not be appropriate.[4]

This is not to say that uncertainty regarding a party's future dealing with the asset should prevent attempts to value it,[5] and I agree with the majority that the issue here involves the appropriate valuation methodology to use under the facts and circumstances of this case. Where I must part company with my colleagues is in finding that the trial court erred in accepting plaintiff's expert's methodology of valuation by using the "historical" tax rate of the corporation.

Although the neutral expert found this approach "meaningless" there is insufficient support in the record for this conclusion. The majority accepts this conclusion based on what they consider the neutral's "common sense" view of the valuation methodology he utilized, rather than on the facts as they appear in the record. Essentially, the neutral dismissed the "historical approach" out of hand, but did not demonstrate to the trial court that this approach is inherently improper or should not be applied in this case where the amount of capital gains actually to be paid is uncertain.

Initially, unlike *Dunn* and *Jelke*, there is no indication that defendant's interest in WCI will cease or that WCI will cease operations with the entry of the decree. This is clearly demonstrated by the fact that the equitable distribution award was to be paid out over a period of time and that the payments would

---

3. *Liddle v Liddle*, 140 Wis 2d 132, 410 NW2d 196 (Ct App 1987).
4. *In re Marriage of Hay*, 80 Wash App 202, 907 P2d 334 (Ct App 1995).
5. *Burns v Burns*, 84 NY2d 369, 375 (1994).

in large part be from defendant's earnings from WCI. Hence, there is no real "willing seller and willing buyer" but rather a hypothetical one: a legal fiction created solely to establish a value for WCI for equitable distribution purposes and to compute tax consequences that do not arise immediately as a result of the decree. As noted, other jurisdictions have found that under such circumstances, this is simply too speculative to create an immediate tax impact requiring the dollar-for-dollar discount for trapped-in capital gains. For example, in *Jelke*, the decedent held a minor percentage interest in an ongoing concern which was to continue into the future. The decedent's interest terminated at his death and was valued accordingly. It was also to be paid out immediately, and thus had an immediate tax impact on the estate. Under those circumstances, it was reasonable to apply the dollar-for-dollar discount. This is not the case here. Defendant's interest will continue in WCI and he does not have an immediate tax impact as the payments will be made over a period of time from the earnings of WCI. There is simply nothing here which distinguishes the facts of this case from those of other jurisdictions which rejected the *Dunn* methodology, and I submit there is no reason to reject the rationale of those jurisdictions.

Illustrative in this regard is *In re Marriage of Hay* (80 Wash App 202, 907 P2d 334 [1995], *supra*). The trial court adjusted the gross value of the real estate partnership in question from $119,049 to $101,000 to reflect the capital gains tax that would be paid if the interest were sold. The appellate court reversed, holding that "[b]ecause a sale was not imminent, the trial court erred in considering the capital gains tax consequence when valuing the parties' interest in the real estate partnership" (80 Wash App at 206-207, 907 P2d at 336). In those cases where potential tax consequences on sale have been deducted in valuing the marital estate, even where no immediate sale was contemplated, the property in question had a limited shelf life. In *Liddle v Liddle* (140 Wis 2d 132, 410 NW2d 196 [1987], *supra*), the court found capital gains tax considerations were appropriate where the asset was a tax shelter which would lose its desirability in five to seven years and would most likely be sold. The court concluded that, under those circumstances, the sale date was neither imaginary nor hypothetical. Thus, it seems that, absent an intent to immediately terminate operation, or a reasonably foreseeable date for such termination, most jurisdictions do not find it appropriate to factor in capital gains tax

consequences in arriving at the value of the asset for equitable distribution purposes.[6]

I am mindful of the fact that *Jelke* was decided after these cases. The principles set out in *Jelke* may or may not have had an impact on those decisions. Moreover, although *Dunn* and *Jelke* are not matrimonial cases, the principles of taxation, capital gains and valuation are the same. The controlling principle here is whether the valuation, which will ultimately find its way into a decree embodying the equitable distribution of the assets of this marriage, will have a present and immediate impact and this, in turn, depends on the facts of the case. The issue before us is not whether New York courts should adopt the dollar-for-dollar discount for trapped-in capital gains but rather whether the valuation adopted by the trial court was properly utilized in valuing WCI.

There is no single set methodology for valuing a closely held business (*see Matter of Seagroatt Floral Co. [Riccardi]*, 78 NY2d 439, 445 [1991]). Here, the valuation that the trial court adopted has support in the record. Mindful of the fact that we have the power to review the record de novo, issues of credibility and contrary interpretations of fact are not sufficient to warrant disturbing the court's determination (*see Matter of Cohen v Four Way Features*, 240 AD2d 225 [1997], citing *Matter of Penepent Corp.*, 198 AD2d 782 [1993], *lv denied in part and dismissed in part* 83 NY2d 797 [1994]).

Notwithstanding the majority's lengthy and eloquent argument for its position, on the record before us, there is no reason to substitute our judgment for that of the trial court with respect to the methodology selected to value this corporation. During the extensive trial, the court viewed the witnesses, carefully examined the evidence and wrote a detailed and thoughtful decision. The majority reduces plaintiff wife's award considerably; an award which, notwithstanding a dollar amount which

---

**6.** While some states are not as restrictive concerning an immediate or likely sale (e.g. Colorado, Missouri and Virginia),

"Courts have generally found that consideration of tax consequences is either required or at least appropriate where they [the consequences] are immediate and specific and/or arise directly from the court's decree, but find they are not an appropriate consideration where speculation as to a party's future dealing with property awarded to him or her would be required" (Tracy A. Bateman, Annotation, *Divorce and Separation: Consideration of Tax Consequences in Distribution of Marital Property*, 9 ALR5th 568, 592, § 2 [a]).

appears large by itself, is significantly less than she was entitled to under the trial court's careful analysis of Domestic Relations Law § 236 (B). It must also be emphasized that plaintiff was denied any maintenance because of the valuation the court placed on her share of WCI. To place the burden on plaintiff's counsel for not cross-moving for maintenance at this stage misses the point of the effect of the disposition.

There was a sound factual and legal basis for the court's exercise of its discretion and there is no reason for us to disturb it.

I would therefore affirm the trial court's valuation of WCI.

FRIEDMAN and GONZALEZ, JJ., concur with McGUIRE, J.; SWEENY, J., dissents in part in a separate opinion.

Judgment, Supreme Court, New York County, entered February 3, 2006, modified, on the law and the facts, the provisions thereof (1) reducing the baseline value of WCI by $7,793,292 pursuant to the "historical" rate of annual taxes paid by WCI, (2) determining that the husband's right pursuant to a subscription agreement to purchase additional shares of stock in WCI's predecessor was not his separate property, (3) reducing by $55,712.53 the after-tax value of the proceeds of the securities sold prior to the commencement date of the action but not settled until after that date, (4) determining that the marital interest in WCI is $69,262,977, (5) determining that the value of the marital estate is $99,811,533, (6) directing the husband to pay the wife a distributive award of $22,770,623, payable in quarterly installments of $379,510.50, and (7) determining that the wife's share of the tax liability of WCI is 46.7%, should be vacated and replaced by provisions (1) reducing the baseline value of WCI by $29,572,000 pursuant to the approach of the neutral expert and the husband's expert, (2) determining that the husband's right pursuant to a subscription agreement to purchase additional shares of stock in WCI's predecessor was his separate property and reducing the baseline value of WCI by the value of that right, $196,800, (3) reducing by $211,403.71 the after-tax value of the proceeds of the securities sold prior to the commencement date of the action but not settled until after that date, (4) determining that the marital interest in WCI is $47,131,777.95, (5) determining that the value of the marital estate is $77,680,333.95, (6) directing the husband to pay the wife a distributive award of $11,705,013, payable in quarterly installments of $195,083.55, and (7) determining that the wife's share of the tax liability of WCI is 44.8%, and otherwise af-

firmed, without costs, and the matter remanded to Supreme Court both for a hearing to determine which securities the husband sold, what he did with the proceeds, what costs he incurred selling and reinvesting securities and the amount of the resulting credit to which he is entitled against the distributive award and, following that hearing and a determination of the amount of the credit, entry of an amended judgment consistent with this opinion. Motion seeking leave to reargue stay pending determination of this appeal dismissed as moot.