23CA1280 Marriage of Bailey 03-06-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1280
Jefferson County District Court No. 21DR30933
Honorable Jack W. Berryhill, Judge

---

In re the Marriage of

Charlene M. Bailey,

Appellee and Cross-Appellant,

and

David E. Bailey,

Appellant and Cross-Appellee.

---

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE TOW
Dunn and Graham*, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced March 6, 2025

---

Belzer Law, Aaron B. Belzer, Ashlee N. Hoffman, Boulder, Colorado; Stahly Miner, LLC, Todd A. Stahly, J.P. Prentiss, Denver, Colorado, for Appellee and Cross-Appellant

Caplan & Earnest, LLC, Andrew C. Littman, Craig A. Weinberg, Boulder, Colorado, for Appellant and Cross-Appellee

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24-51-1105, C.R.S. 2024.

¶ 1    David E. Bailey (husband) appeals the permanent orders entered on the dissolution of his marriage to Charlene M. Bailey (wife). He argues that the trial court erred by holding that the parties' premarital agreement (PMA) was invalid and otherwise unenforceable. Wife cross-appeals the trial court's division of the marital property, asserting that the court erred in its valuation of husband's business. We affirm the judgment as to wife's cross-appeal, reverse the judgment as to husband's appeal, and remand for further proceedings.

## I.    Background

¶ 2    The parties married in 2006. In January 2000, over six years before their marriage, wife executed the PMA, which already bore husband's signature when it was presented to her. At the time, the parties had been in a relationship for approximately five years. Wife testified that while the parties had previously discussed entering into a premarital agreement, it had been a source of disagreement in their relationship because she adamantly opposed such an agreement.

¶ 3    According to wife, husband presented the PMA to her shortly after the parties had moved together into a new house, and his

presentation of the PMA resulted in a significant argument. While wife initially refused to sign, she testified that over the course of the argument, husband became "angry" and was "personally attacking" her. She asserted that she was not afforded any time to read the PMA, discuss it with an attorney, or review certain handwritten annotations that husband had made on the document. After an hour of arguing, wife angrily signed the PMA on a page titled, "Statement of Counsel," which contained signature blocks for the parties' respective attorneys to acknowledge the PMA. The PMA was not notarized, and the signature block for wife's signature was left blank.

¶ 4 Wife explained that she eventually signed because husband would not stop "pressuring" and "badgering" her to sign, and she "needed to get out of the situation" because she was afraid husband would "snap." Exhibits where the parties could provide financial disclosures were left blank. However, wife acknowledged that she had been generally aware of husband's finances before the parties were married.

¶ 5 The dissolution proceedings were bifurcated. After an initial hearing on the validity of the PMA, the trial court held that the PMA

2

was neither valid nor enforceable under Colorado law based on "procedural unconscionability" surrounding the PMA's execution.

¶ 6    At the hearing on the division of the marital property, the parties called multiple expert witnesses to opine on the premarital and present value of husband's interest in his family's longstanding business, Erie County Investment Co. (Erie). The trial court ultimately adopted, with minor alterations, the valuations proposed by husband's experts. Accordingly, the trial court found that husband's separate, premarital interest in Erie was worth $19,355,581 and his present interest in Erie was worth $21,754,061, meaning that there was a $2,398,480 increase in the value of Erie that qualified as marital property, which the court allocated.

## II.    Husband's Appeal Concerning the Validity and Enforceability of the PMA

¶ 7    Husband's sole contention on appeal is that the trial court erred by refusing to enforce the PMA. Because we agree that the trial court strayed from the applicable legal standards and otherwise made insufficient factual findings, we conclude that further proceedings are necessary.

## A. The Colorado Marital Agreement Act

¶ 8    Because the PMA was executed by wife in 2000, the Colorado Marital Agreement Act (CMAA) applies.  *See* § 14-2-310, C.R.S. 2000 (providing that the CMAA is applicable to all premarital agreements signed after July 1, 1986); § 14-2-303, C.R.S. 2024 (applying the later, Uniform Premarital and Marital Agreements Act to all premarital agreements signed after July 1, 2014).

¶ 9    Under the CMAA, a marital or premarital agreement must be in writing and signed by both parties.  § 14-2-303, C.R.S. 2000.  However, a premarital agreement is not otherwise enforceable if the party opposing enforcement proves (1) that "[s]uch party did not execute the agreement . . . voluntarily" or (2) that "[b]efore execution of the agreement . . . such party was not provided a fair and reasonable disclosure of the property or financial obligations of the other party."  § 14-2-307(1), C.R.S. 2000; *In re Marriage of Goldin*, 923 P.2d 376, 380 (Colo. App. 1996) ("Absent involuntary execution or unfair and unreasonable disclosure . . . , a marital agreement is enforceable.").

¶ 10    While the CMAA does not define "voluntarily," or what constitutes a "fair and reasonable disclosure," *see* § 14-2-307(1),

4

C.R.S. 2000, the supreme court has explained that "[t]he General Assembly's overriding intent in passing the CMAA was to codify Colorado's common law regarding marital agreements." *In re Marriage of Ikeler*, 161 P.3d 663, 668 (Colo. 2007). Thus, we may look to Colorado cases concerning premarital agreements that predate the CMAA to inform our interpretation of the statute. *See id.*

¶ 11　　We review the trial court's interpretation of the CMAA and its other conclusions of law de novo. *Id.* at 666. In interpreting the CMAA, we first look to the language of the statute and afford the words their plain and ordinary meanings, and we must consider the statute as a whole and interpret it in order to give consistent, harmonious, and sensible effect to all its parts. *Id.* at 666-67. If the language in the statute is clear, it must be applied as written. *In re Marriage of Zander*, 2019 COA 149, ¶ 12, *aff'd*, 2021 CO 12.

¶ 12　　We defer to the trial court's factual findings unless they are clearly erroneous, meaning that there is no evidence to support them. *In re Marriage of Dean*, 2017 COA 51, ¶ 8. However, the court must make findings of fact and conclusions of law sufficiently

explicit to give us a clear understanding of the basis of its order. *See* C.R.C.P. 52; *In re Marriage of Gibbs*, 2019 COA 104, ¶ 9.

## B.    Discussion

### 1.    The Trial Court's Order

¶ 13    In its written order invalidating the PMA, the trial court cited the CMAA and acknowledged that a premarital agreement is invalid if not executed voluntarily or if there was not adequate disclosure of the parties' respective property and finances.  But the trial court, relying primarily on secondary sources and foreign authority, invalidated the PMA based on "procedural unconscionability" at the time of its execution.

¶ 14    The trial court reasoned that while wife in fact signed the PMA, she did not sign it intelligently or knowingly.  The court cited the fact that wife was unrepresented, and the "anger and emotional turmoil" surrounding the PMA's presentation to her "without any prior explanation to her of [its] contents and provisions."

¶ 15    The trial court also expressed concern that wife received inadequate financial disclosures because there was no evidence as to what information she had received and as to when she received it, especially given the PMA's blank disclosure exhibits.  Based on

the totality of the circumstances surrounding the PMA's execution, the court concluded that "such defective procedures" made the PMA "unconscionable and unenforceable." Because the court concluded that the circumstances surrounding the PMA's execution were unconscionable, it did not review the substance of the document for unconscionability.

### 2. The PMA Constituted a Premarital Agreement

¶ 16 As an initial matter, we reject wife's assertion that we should affirm because the PMA did not constitute a "marital agreement" as defined by the CMAA, making it unenforceable. In its written order, the trial court questioned, without deciding, whether the PMA in fact constituted a marital agreement.

¶ 17 The CMAA defines a marital agreement as "an agreement . . . between prospective spouses made in contemplation of marriage." § 14-2-302(1), C.R.S. 2000. Wife argues that the PMA was not "made in contemplation of marriage." But the PMA unambiguously states that the parties "may contemplate marriage to each other," and that the parties desired that "their cohabitation and possible marriage shall not in any way change their current legal rights." We conclude that such language sufficiently establishes that the

PMA was "made in contemplation of marriage" and, thus, the CMAA applies.

¶ 18    Wife cites *In re Marriage of Green*, 169 P.3d 202, 203 (Colo. App. 2007), where the court declined to enforce an agreement under the CMAA because the parties were not contemplating marriage. But *Green* is distinguishable because the agreement there only stated that the parties intended "to live together" and did not reference marriage in any way.  *See id.*  Consequently, we conclude that the PMA falls within the definition of a "marital agreement" in section 14-2-302(1), C.R.S. 2000, and we proceed to consider husband's argument that the trial court otherwise erred by invalidating the PMA.

### 3.    Further Findings Are Required on Whether Wife Executed the PMA "Voluntarily"

¶ 19    Husband argues that the trial court erred by invalidating the PMA based on "procedural unconscionability" because such a defense to enforcement of a premarital agreement is not found within the CMAA.  We agree.

¶ 20    Section 14-2-307, C.R.S. 2000, contains only three defenses to the enforcement of a premarital agreement: (1) that the agreement

8

was not executed voluntarily; (2) that the party opposing enforcement did not receive "fair and reasonable" disclosure of the other party's property or financial obligations; and (3) that, at the time of enforcement, the agreement's provisions as to spousal maintenance are unconscionable. *See* § 14-2-307(1), (2), C.R.S. 2000. The inclusion of these specific statutory defenses suggests to us that the legislature intended the enumerated defenses to be the exclusive defenses to the enforcement of a premarital agreement. *See Beeghly v. Mack*, 20 P.3d 610, 613 (Colo. 2001) (recognizing that under the canon of statutory interpretation *expressio unius est exclusio alterius*, omissions from a statute are given the same effect as inclusions, meaning that the inclusion of certain items implies the exclusion of others).

¶ 21    Accordingly, we conclude that the defense of "procedural unconscionability," which is not found in section 14-2-307, C.R.S. 2000, was not a basis for invalidating the PMA. *See Beeghly*, 20 P.3d at 613; *Zander*, ¶ 12. And because the court invalidated the PMA based on procedural unconscionability, it never decided whether wife executed the PMA voluntarily under section 14-2-307(1), C.R.S. 2000. Indeed, we cannot locate any place in the

9

relevant order where the court explicitly found that the PMA was either voluntarily or involuntarily executed by wife. Therefore, we remand the case for findings on whether the PMA was entered into voluntarily.

¶ 22 That being said, we reject husband's claim that, as a matter of law, wife "voluntarily" signed the agreement merely because she "intended" to sign it. Rather, whether wife voluntarily entered into the agreement is a factual inquiry that must be left to the trial court to decide in the first instance, applying traditional concepts of voluntariness as the court identified in its original order.

¶ 23 Moreover, because of the trial court's erroneous application of the law to declare the PMA unenforceable, it never analyzed whether the provisions of the agreement regarding maintenance would be unconscionable at the time of enforcement. *See* § 14-2-307(2), C.R.S. 2000. Thus, if the court determines on remand that wife voluntarily executed the PMA, it must consider that partial defense to the enforceability of the agreement. We express no opinion on the outcome of either analysis.

## 4. Wife's General Knowledge of Husband's Finances Was Sufficient

¶ 24 Husband next argues that the trial court erred in holding that he had not sufficiently disclosed his financial information to wife at the time the PMA was executed. While the trial court did not make explicit findings as to whether wife was provided with "a fair and reasonable disclosure" of husband's finances, *see* § 14-2-307(1)(b), C.R.S. 2000, because the court found that wife was generally aware of husband's finances, we agree with husband that wife received a "fair and reasonable" disclosure of husband's financial information as a matter of law.

¶ 25 Under the common law that the CMAA codified, *see Ikeler*, 161 P.3d at 668, a fair and reasonable financial disclosure does not require the parties to exchange a detailed list of assets. *In re Estate of Lewin*, 595 P.2d 1055, 1058 (Colo. App. 1979). Instead, "[f]air disclosure contemplates that each spouse should be given information, of a general and approximate nature, concerning the net worth of the other," *In re Estate of Lopata*, 641 P.2d 952, 955 (Colo. 1982), and a party's "general knowledge of the extent of [the other party's] assets, . . . even though she may have been unaware

11

of their exact value," may constitute sufficient disclosure. *In re Marriage of Ingels*, 596 P.2d 1211, 1214 (Colo. App. 1979).

¶ 26    For instance, in *Newman v. Newman*, 653 P.2d 728, 733 (Colo. 1982), the premarital agreement was held enforceable where the wife "had access to the records of her husband's financial interests when she worked for him as a bookkeeper and later during their two years of courtship," and wife decided to sign the agreement "with full knowledge that her husband was a person of substantial wealth." Similarly, in *In re Marriage of Rahn*, 914 P.2d 463, 465 (Colo. App. 1995), "[e]ven though the prenuptial agreement contemplated that the parties would attach lists of their assets, [and] neither party complied," the agreement was nevertheless enforceable given the wife's general knowledge of the husband's assets. *See also In re Estate of Stever*, 392 P.2d 286, 287 (Colo. 1964) (agreement enforceable where the wife "had known [husband] more than thirty years, . . . she knew he had property in Kansas, knew he had ranch property in Colorado[,] and . . . she had visited some of [the husband's] ranch properties").

¶ 27    Here, the trial court found that while there "was testimony about Wife's access to financial information and data about

12

Husband's assets and income, there was no credible evidence about *what* financial information and data she actually had, or when, or what such financial information actually disclosed."  The trial court cited the blank financial disclosure exhibits at the end of the PMA. Yet, with record support, the trial court also acknowledged wife's concession "that she was generally aware of Husband's assets when they moved together [in December of 1999], although not their exact values."

¶ 28    But because general knowledge of the other party's assets is sufficient, even where the parties may have failed to include an exhibit listing their assets, we conclude as a matter of law that the trial court's finding that wife generally knew of husband's assets less than a month before her execution of the PMA was sufficient to satisfy the CMAA's reasonable and fair financial disclosure requirement.  *See Rahn*, 914 P.2d at 465; *Ingels*, 596 P.2d at 1214.

III.    Wife's Cross-Appeal as to the Valuation of Husband's Business

¶ 29    Because the trial court, on remand, may again find that the PMA is unenforceable, we address wife's cross-appeal, which challenges the trial court's premarital valuation of husband's interest in Erie.  Specifically, wife argues that the trial court

13

undervalued husband's premarital interest by approximately $4.4 million because the court erroneously failed to adjust the value of husband's interest for certain "built-in capital gains taxes" that Erie would have to pay as a C corporation. In other words, wife contends that, when determining the value of the business at the time of the marriage nearly twenty years ago — a business that was not pending sale at the time of the marriage and, indeed, was not sold during the marriage — the court was required to consider the potential tax liability on unrealized capital gains. We are not persuaded.

A. Standards of Review and Applicable Law

¶ 30    When dividing marital assets, the court may select the valuation of one party over that of the other party or make its own valuation, and its decision will be affirmed if the value is reasonable in light of the evidence as a whole. *In re Marriage of Medeiros*, 2023 COA 42M, ¶ 41; *In re Marriage of Krejci*, 2013 COA 6, ¶ 23 (recognizing that a valuation will be upheld "unless clearly erroneous"). However, we review the trial court's conclusions of law de novo. *In re Marriage of Cardona*, 321 P.3d 518, 523 (Colo. App. 2010), *aff'd*, 2014 CO 3.

¶ 31 In valuing a marital asset, the trial court "may, in its discretion, consider tax consequences." *In re Marriage of Finer*, 920 P.2d 325, 332 (Colo. App. 1996). For instance, *In re Marriage of Bayer*, 687 P.2d 537, 539 (Colo. App. 1984), held that the district court had the discretion to determine whether an equitable division of the marital property was best achieved by considering the net equity or gross equity in the parties' mountain condominium. *Id.* Because "there was no evidence of a potential sale of the property," the *Bayer* division held that the district court had not abused its discretion by refusing to consider capital gains taxes that the husband would pay in the event of a sale. *Id.*

¶ 32 Similarly, in *Finer*, 920 P.2d at 332, the division held that the district court abused its discretion by subtracting selling costs and capital gains taxes from the value of a condominium where there was "no evidence as to whether [the] husband intended to keep or to sell" the property. The court reasoned that whether to adjust for such costs involves "a determination whether the property will actually be sold, thereby resulting in a net equity." *Id.*; *see also In re Marriage of Woodrum*, 618 P.2d 732, 734 (Colo. App. 1980) (holding that in valuing the marital home, the district court could,

15

within its discretion, deduct estimated real estate commissions and capital gains taxes), *overruled on other grounds by In re Marriage of Nussbeck*, 974 P.2d 493 (Colo. 1999).

<h2 align="center">B.     Discussion</h2>

¶ 33     Here, although wife argued, based on federal decisions valuing C corporations for tax purposes, that the trial court was required to deduct mandatory capital gains taxes from the premarital valuation of Erie, the trial court disagreed. *See Eisenberg v. Comm'r*, 155 F.3d 50, 54-59 (2d Cir. 1998) (holding that for gift tax purposes, "an adjustment for potential capital gains tax liabilities should be taken into account in valuing the stock at issue in the closely held C corporation" because a hypothetical buyer would take into account unavoidable "built-in" capital gains taxes that had been imposed on C corporations since 1986); *Est. of Jelke v. Comm'r*, 507 F.3d 1317, 1318-21 (11th Cir. 2007) (holding the same for estate tax valuation purposes).

¶ 34     The trial court reasoned that because there was no evidence of a contemplated sale of Erie or its assets, the taxes that may apply to a future sale were speculative. The court cited the testimony of husband's first expert witness, who had valued Erie as a "going

16

concern" and had stated that it was inappropriate to deduct capital gains taxes under *Bayer*. The court rejected the federal tax cases cited by wife as not applicable to the Uniform Dissolution of Marriage Act, and adopted the reasoning of husband's experts, who had valued Erie based on the assumption that the business was not going to be liquidated but would continue operating.

¶ 35    Wife asks us to reverse the trial court's valuation and hold as a matter of law that the trial court was required to consider capital gains taxes when valuing Erie as a C corporation. But we decline to do so because the Colorado Supreme Court has previously refused to impose per se legal tests governing the valuation of marital property given the discretion vested in trial courts to divide marital estates equitably. *See In re Marriage of Thornhill*, 232 P.3d 782, 787 (Colo. 2010).

¶ 36    Specifically, in *Thornhill*, 232 P.3d at 785, the supreme court declined to adopt an overarching rule prohibiting the application of marketability discounts to the valuation of an ownership interest in a closely held corporation. Even though the supreme court had previously prohibited marketability discounts in the context of a corporation buying out a dissenting minority shareholder, *see*

*Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353 (Colo. 2003), the *Thornhill* court refused to extend that blanket prohibition to dissolution of marriage proceedings. *Thornhill*, 232 P.3d at 785. The court reasoned that section 14-10-113, C.R.S. 2024, did not specifically require marital assets to be assigned their fair market value, and that said section instead gave district courts "broad discretion to divide marital property as they 'deem[] just' after 'considering all relevant factors.'" *Thornhill*, 232 P.3d at 786 (quoting § 14-10-113(1)). Consequently, *Thornhill* left the application of a marketability discount to the discretion of the trial court because "the language of the marriage dissolution statute suggests that a case-by-case approach is most appropriate." *Id.* at 787.

¶ 37     We see no reason to depart from *Thornhill* here, as nothing in the text of section 14-10-113(1) suggests that the trial court was required, as a matter of law, to account for capital gains taxes in valuing Erie, as opposed to valuing and dividing the marital estate in a way that the court deemed just. While wife cites two out-of-state cases that required unrealized capital gains tax liability to be accounted for when valuing a C corporation during divorce

18

proceedings, *see Bathke v. Costley*, 332 So. 3d 1076, 1078 (Fla. Dist. Ct. App. 2021); *Wechsler v. Wechsler*, 866 N.Y.S.2d 120, 122–29 (App. Div. 2008), we decline to mandate such a valuation approach because *Thornhill*, 232 P.3d at 787, affords trial courts substantial discretion to value assets on a case-by-case basis.

¶ 38    Nor do we perceive any abuse of the trial court's substantial discretion here. In declining to include the potential tax liability on unrealized capital gains in its valuation of Erie, consistent with *Bayer*, 687 P.2d at 539, and *Finer*, 920 P.2d at 332, the trial court found that there was no indication that a sale of Erie, and thus the payment of capital gains taxes, was imminent. *Cf. In re Marriage of Dale*, 87 P.3d 219, 226 (Colo. App. 2003) ("[A] trial court is not obligated to consider hypothetical tax implications.").

¶ 39    Moreover, the trial court's findings were supported by the testimony of husband's expert, who stated that as of the premarital valuation date, no portions of Erie were for sale. And the trial court's finding that Erie's tax liability was speculative likewise enjoyed record support. Wife's own expert conceded that capital gains taxes were not payable until the actual liquidation of Erie, and experts for both parties acknowledged that, had there been a

19

sale, at least some capital gains taxes could possibly have been avoided at the time of the premarital valuation using a "1031 exchange." *Cf. In re Marriage of Grubb*, 721 P.2d 1194, 1196 (Colo. App. 1986) (no abuse of discretion in refusing to consider tax consequences where "although a tax liability was certain, the amount of such liability was speculative"), *rev'd on other grounds*, 745 P.2d 661 (Colo. 1987). While wife points to other evidence, such as internal Erie documents that considered potential tax liability on unrealized capital gains, the trial court, as fact finder, was free to weigh such evidence as it saw fit. *In re Marriage of Lewis*, 66 P.3d 204, 207 (Colo. App. 2003) (recognizing that credibility determinations and the weight, probative force, and sufficiency of the evidence, as well as the inferences and conclusions to be drawn therefrom, are within the trial court's sole discretion).

¶ 40    We also disagree with wife's assertion that the trial court erred because it concluded that it was categorically prohibited from considering Erie's potential tax liability on unrealized capital gains. Nowhere in the permanent orders did the trial court make such a ruling. Instead, the court acknowledged *Bayer*, 687 P.2d at 539,

which affords the court the discretion to consider capital gains taxes, and it emphasized that it had exercised that discretion when selecting between each party's respective valuation.

¶ 41 Finally, to the extent that wife argues that the trial court erred because husband's experts were allowed to impermissibly express an opinion on the applicable law, we decline to review her contention given her lack of a contemporaneous objection to that testimony. *See* CRE 103(a); *see also People v. Martinez*, 549 P.2d 758, 760 (Colo. 1976) ("It is axiomatic that contemporaneous objections must be made to allegedly erroneous rulings."). Likewise, we decline to consider wife's contention, raised for the first time in her reply brief, that the trial court made an additional valuation error because it calculated the premarital value of Erie without considering capital gains taxes, but then included such capital gains taxes when determining the present value of Erie, resulting in an inconsistent valuation. *See In re Marriage of Herold*, 2021 COA 16, ¶ 14 (issue raised for the first time in reply brief will not be addressed).

¶ 42 In sum, we affirm the trial court's determination of both the premarital and marital values of husband's interest in Erie, and in

the event the trial court again determines on remand that the PMA is unenforceable, it may reinstate its original marital property division.

### IV. Disposition

¶ 43 The portion of the judgment determining the premarital and marital values of husband's interest in Erie is affirmed. The portion of the judgment determining the enforceability of the PMA is reversed, and the case is remanded for further proceedings.

¶ 44 On remand, the court shall first reconsider whether wife voluntarily executed the PMA and make findings accordingly. If the court finds wife did not voluntarily execute the PMA, it may reinstate the original marital property division.

¶ 45 If, on the other hand, the court finds wife voluntarily executed the PMA, it must re-open the marital property division to enforce the applicable provisions of the PMA and allow the parties to present additional evidence on their present economic circumstances. If the court reopens the marital property division, it must also consider whether the provisions of the PMA regarding maintenance are presently unconscionable.

¶ 46     Those portions of the judgment not challenged on appeal remain undisturbed.

JUDGE DUNN and JUDGE GRAHAM concur.